# Exhibit A

| Appendix B: Participant Access and Eligibility |
|---|
| HCBS Waiver Application Version 3.3 – October 2005 |

# Appendix B: Participant Access and Eligibility

## Appendix B-1: Specification of the Waiver Target Group(s)

a. **Target Group(s).** Under the waiver of Section 1902(a)(10)(B) of the Act, the State limits waiver services to a group or subgroups of individuals. *In accordance with 42 CFR §441.301(b)(6), select one waiver target group, check each subgroup in the selected target group that may receive services under the waiver, and specify the minimum and maximum (if any) age of individuals served in each subgroup:*

| INCLUDED | TARGET GROUP/SUBGROUP | MINIMUM AGE | MAXIMUM AGE LIMIT: THROUGH AGE – | NO MAXIMUM AGE LIMIT |
|---|---|---|---|---|
| ○ | Aged or Disabled, or Both | | | |
| ☐ | Aged (age 65 and older) | | | ☐ |
| ☐ | Disabled (Physical) (under age 65) | | | |
| ☐ | Disabled (Other) (under age 65) | | | |
| | Specific Aged/Disabled Subgroup | | | |
| ☐ | Brain Injury | | | ☐ |
| ☐ | HIV/AIDS | | | ☐ |
| ☐ | Medically Fragile | | | ☐ |
| ☐ | Technology Dependent | | | ☐ |
| ☒ | Mental Retardation or Developmental Disability, or Both | | | |
| ☐ | Autism | | | ☐ |
| ☒ | Developmental Disability | 0 | | ☒ |
| ☐ | Mental Retardation | | | ☐ |
| ○ | Mental Illness | | | |
| ☐ | Mental Illness (age 18 and older) | | | ☐ |
| ☐ | Serious Emotional Disturbance (under age 18) | | | |

b. **Additional Criteria.** The State further specifies its target group(s) as follows:

> Individuals must meet the Division of Developmental Disabilities' (DDD) definition of "developmental disability" as contained in state law and stipulated in state administrative code.
>
> Washington state regulations and administrative codes stipulate that a developmental disability must meet the following minimum requirements:
>
> (a) Be attributable to mental retardation, cerebral palsy, epilepsy, autism, or another neurological or other condition found by DDD to be closely related to mental retardation or requiring treatment similar to that required for individuals with mental retardation;
>
> (b) Originate prior to age eighteen;
>
> (c) Be expected to continue indefinitely; and

| State: | Washington | |
|---|---|---|
| Effective Date | 4/1/2008 (Amended) | Appendix B-1: 1 |

Exhibit A

| Appendix B:  Participant Access and Eligibility |
|---|
| HCBS Waiver Application Version 3.3 – October 2005 |

> **(d) Result in substantial limitations to an individual's adaptive functioning.**
>
> The individuals on this waiver require residential habilitation services or live at home but are at immediate risk of out of home placement due to one or more of the following extraordinary needs.
> - The individual has extreme and frequently occurring behavior challenges resulting in danger to health or safety or
> - Has had 18 or more days of inpatient psychiatric care in the past 12 months or
> - The individual lives in an ICF/MR and requests community placement or
> - Requires daily to weekly one-on-one support, supervision and 24-hour access to trained others to meet basic health and safety needs.

c.  **Transition of Individuals Affected by Maximum Age Limitation.**  When there is a maximum age limit that applies to individuals who may be served in the waiver, describe the transition planning procedures that are undertaken on behalf of participants affected by the age limit *(select one)*:

| | |
|---|---|
| ☒ | Not applicable – There is no maximum age limit |
| ○ | The following transition planning procedures are employed for participants who will reach the waiver's maximum age limit (*specify*): |
| | |

# Exhibit B

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop S2-26-12
Baltimore, Maryland  21244-1850



### Center for Medicaid, CHIP, and Survey & Certification

SMDL# 11-009
ACA# 19

August 5, 2011

Dear State Medicaid Director:

This letter and the accompanying Questions and Answers (Q&As) are part of a series that provide guidance on the "maintenance of effort" (MOE) provisions in the Patient Protection and Affordable Care Act, P.L. 111-148, as amended by the Health Care and Education Reconciliation Act of 2010, P.L. 111-152 (together known as the Affordable Care Act).  The policies contained in the attached Q&As build upon and clarify the guidance previously issued on the MOE provisions of the American Reinvestment and Recovery Act (the Recovery Act) and their relationship to institutional level of care requirements and home and community-based services (HCBS).  We have also included a question and answer regarding ways in which States who have identified a program integrity concern can strengthen program integrity procedures consistent with the MOE provisions.

Many States provide institutional care and HCBS to individuals who are eligible for Medicaid based on their need for those services.  HCBS are a vital element of State efforts to build cost-effective, person-centered systems that provide services that enable individuals to remain in or return to their homes and communities and avoid institutional services.  In the enclosed Q&As, we address the Affordable Care Act MOE provisions as they relate to institutional care and HCBS, based on questions we have received.  We note that States continue to have opportunities to make adjustments to services within their HCBS waivers that are not related to eligibility and thus do not implicate MOE.  States also have flexibility to modify their HCBS when a waiver authorizing such services expires.

Medicaid-financed HCBS are frequently the key component of State strategies to deliver services for persons with disabilities that comply with the Americans with Disabilities Act (ADA), the Supreme Court's Olmstead decision and subsequent Federal court opinions interpreting that decision (see our May 20, 2011 State Medicaid Director Letter at http://www.cms.gov/smdl/downloads/SMD10008.pdf).  For that reason, we stress that this guidance pertains only to the Medicaid MOE provisions and does not address a State's independent and ongoing obligations under the ADA.   States can get further information with respect to ADA compliance by contacting the Department of Health and Human Services (HHS), Office for Civil Rights (OCR) at OCR.Olmstead@hhs.gov or consulting OCR's website at http://www.hhs.gov/ocr. Information about ADA community integration cases and settlements in which the Civil Rights Division of the U.S. Department of Justice is involved may be found at http://www.ada.gov/.

We recommend that States contact CMS for technical assistance with the MOE provisions if they are interested in pursuing any changes to their long-term care policies.  We note that other provisions of the Affordable Care Act, such as the Balancing Incentive Program and Community First Choice Option, include maintenance requirements for certain aspects of the Medicaid program in order to

Page 2 – State Medicaid Director

receive new, increased Federal matching payments. This letter does not address a State's requirements under those provisions; however, States may want to review these separate program requirements as they consider actions that affect the provision of HCBS.

Please submit any questions you have about the Affordable Care Act MOE provisions relating to HCBS to Ms. Barbara Edwards at Barbara.Edwards@cms.hhs.gov.

We hope this guidance is informative. We note that previous guidance on the Affordable Care Act MOE provisions—specifically on the topics of 1115 demonstrations, premiums and the non-application provision—was contained in our February 25, 2011 State Medicaid Director letter available at http://www.cms.gov/smdl/downloads/SMD11001.pdf. For general questions about MOE please contact Penny Thompson at Penny.Thompson@cms.hhs.gov.

Sincerely,

/s/

Cindy Mann
Director

Page 3 – State Medicaid Director

Enclosures

cc:

CMS Regional Administrators

CMS Associate Regional Administrators
Division of Medicaid and Children's Health

Matt Salo
Executive Director
National Association of Medicaid Directors

Alan R. Weil, J.D., M.P.P.
Executive Director
National Academy for State Health Policy

Director of Health Legislation
National Governors Association

Rick Fenton
Acting Director
Health Services Division
American Public Human Services Association

Christine Evans, M.P.H.
Director, Government Relations
Association of State and Territorial Health Officials

Debra Miller
Director for Health Policy
Council of State Governments

Joy Wilson
Director, Health Committee
National Conference of State Legislatures

Nancy Thaler
Executive Director
National Association of State Directors of Developmental Disabilities Services

Martha Roherty
Executive Director
National Association of States United for Aging and Disability

ENCLOSURE A: THE AFFORDABLE CARE ACT
MAINTENANCE OF EFFORT (MOE)--QUESTIONS & ANSWERS

**Q1.** **Are there flexibilities that a State can utilize to manage their section 1915(c) home and community-based care services (HCBS) waivers?**

Answer. Yes. States maintain flexibility to implement mechanisms that simplify administration and control costs in their HCBS waivers. States also can combine waivers of similar target groups for administrative simplicity as long as eligibility criteria remain the same.

While the MOE provisions of the Affordable Care Act require that States maintain eligibility standards, methodologies and procedures, the MOE provisions do not affect a State's ability to manage waiver costs by modifying waiver benefits, rates or introducing new waiver service-specific medical necessity criteria or utilization controls which do not affect individuals' eligibility for Medicaid. For example, a State may change the criteria for receipt of a particular service that would not impact an individual's overall Medicaid eligibility, but would instead impact their ability to receive a specific service.   However, States must also carefully consider the implications of such changes on their obligations to ensure the health and welfare of individuals served within the waiver programs, as well as their community integration obligations under the Americans with Disabilities Act (ADA) and the right of individuals to receive public benefits in the most integrated setting appropriate to their needs.  That is, irrespective of whether there is an MOE issue, a reduction in benefits could potentially result in individuals losing the ability to have their needs met and live in a home and community-based setting, which could have implications under the ADA, the Olmstead decision, and subsequent Federal court decisions.  For example, a reduction in benefits could place individuals with disabilities living in the community at risk of institutionalization or could make it more difficult for individuals who are inappropriately institutionalized to leave the institution and receive services in the most integrated setting.

As detailed in our May 20, 2010 State Medicaid Director Letter at http://www.cms.gov/smdl/downloads/SMD10008.pdf, there are a variety of mechanisms available to States to rebalance their long-term support systems for persons with disabilities to achieve compliance with the ADA.

**Q2.** **How does Institutional Level of Care, which serves as the level of care for HCBS waivers as well, interact with MOE?**

Answer. Because the Recovery Act MOE, its extension, and the Affordable Care Act MOE use the same language, we are applying the same basic principle we articulated in the Recovery Act MOE to the Affordable Care Act MOE.  As outlined in our August 19, 2009 guidance on Recovery Act MOE (http://www.cms.gov/SMDL/downloads/SMD081909.pdf), implementing more stringent institutional level of care (LOC) criteria affects eligibility for individuals in institutional and section 1915(c) home and community-based settings and therefore are considered

more restrictive eligibility policies. Individuals eligible for Medicaid through their receipt of HCBS waiver services are in an eligibility group defined in regulation at 42 CFR 435.217.

However, States may upwardly adjust institutional LOC criteria in order to promote community-based care and to achieve cost savings in ways that are consistent with the MOE provision. Under these circumstances, the adjustment will not change eligibility, but rather the setting in which services are provided. Below are examples to illustrate this flexibility:

    a. A State may upwardly adjust its institutional LOC criteria if it has an alternative vehicle to offer Medicaid eligibility to long-term care services and support in the community to all individuals that would have previously been able to gain eligibility under the original LOC. For example, a State could design a 1915(i) benefit package that is narrowly targeted to individuals who would have been eligible under former LOC levels. In this example, the State, through an eligibility group that provides Medicaid eligibility based on need for 1915(i) services, would ensure continued access to Medicaid eligibility for those who no longer meet LOC levels. The State would then need to ensure that the financial and needs-based criteria for the eligibility group are crafted in a manner that protects Medicaid eligibility for all individuals previously eligible under the former LOC.

    b. Another example may be a State that operates an 1115 demonstration offering different levels of care for receipt of HCBS and institutional services, ensuring that the available capacity for Medicaid eligibility remains unchanged.

    c. A State may also upwardly adjust its institutional LOC if it does not cover the 42 CFR 435.217 group in its waivers, provided such an adjustment would not result in individuals in institutions losing eligibility for Medicaid. Loss of eligibility, and a resulting MOE issue, could occur if an upward adjustment in institutional LOC means that some individuals eligible under the special income level group would have to leave the institution because they do not meet the new LOC criteria, but could not then maintain eligibility in the community because the State does not cover the 435.127 group for waiver services. To upwardly adjust its institutional LOC while adhering to the MOE, a State that does not cover the 435.217 group for waiver services must be able to make its adjustments without negatively impacting Medicaid eligibility.

**Q3.** **How is the termination or modification of a Medicaid HCBS waiver affected by the Affordable Care Act MOE provisions?**

Answer. The requirements for HCBS waivers and the Affordable Care Act MOE are similar to the policies outlined for 1115 demonstrations in our February 25, 2011 State Medicaid Director Letter (http://www.cms.gov/smdl/downloads/SMD11001.pdf). Every HCBS waiver is approved for a time-limited period, after which the waiver continues operation only if a State requests a renewal. The MOE provisions in the Affordable Care Act do not require a State to request that the Secretary continue a HCBS waiver after the date that the waiver would expire under the approval in effect on March 23, 2010. States may discontinue HCBS waivers when the approval period expires. If a State requests a renewal at the end of the approved waiver period in effect as of March 23, 2010, with modifications to the waiver program, it may do so. This would not create an MOE issue. States that do not renew a waiver or that make modifications that have the effect of constricting waiver eligibility must provide to CMS a transition/phase-out plan that describes steps to ensure minimal adverse impact on individuals served. This plan should include, at a minimum: (a) efforts to evaluate individuals who would lose eligibility to see if they may be eligible under another category of Medicaid eligibility, and to link such individuals with continued Medicaid eligibility without a lapse in coverage; and (b) a plan for how the State will phase out treatment services and what alternative services, if any, are available to the impacted individuals. This should be submitted to CMS at least 60 days before waiver expiration.

If a State seeks to modify waiver programs in ways that would restrict eligibility standards, methodologies or procedures before the demonstration approval period has expired, that would not be consistent with the MOE provisions.

We strongly encourage States interested in pursuing these options to contact CMS for technical assistance in order to ensure that any changes made to LOC are consistent with the MOE provisions.

**Q4.** **What program-integrity related changes to eligibility processes are permissible under the MOE provisions?**

Ensuring that Medicaid and CHIP cover all eligible people consistent with the highest standards of program integrity is a priority for the Federal government. At the same time, Congress in drafting the Affordable Care Act MOE provision explicitly limited changes not just to eligibility standards, but also to eligibility methods and procedures. There is extensive evidence that eligibility methods and procedures are strong determinants of whether eligible individuals can actually gain and retain coverage. Our experience working with States suggests States can meet their program integrity objectives consistent with the MOE provisions.

Specifically, State administrative activities that address an identified program integrity issue can be designed in ways that do not make the eligibility and renewal process more restrictive and burdensome for eligible individuals. For example, States may:

- Undertake administrative activities, such as conducting data matches to verify eligibility information and pursuing any questions that might arise from these

matches; this would include implementing corrective action procedures of this nature to address specific program integrity issues identified in the payment error rate measurement (PERM) or audit review processes;

- Improve State program integrity implementation efforts, if the policies were in effect, but had not been fully implemented by the State;
- Change transfer of assets requirements to the extent they affect benefits rather than eligibility.

States that have specific program integrity concerns should contact CMS for technical assistance so that we can work with the State in taking any necessary steps to strengthen program integrity while ensuring compliance with the MOE provision.

# Exhibit C



315 - 5th Avenue South, Suite 850
Seattle, WA 98104
T:  206-324-1521    800-562-2702
TTY: 206-957-0728   800-905-0209
F:  206-957-0729
www.DisabilityRightsWA.org

November 4, 2009

Janet Adams
Division of Developmental Disabilities
Department of Social and Health Services
Olympia, Washington 98504
adamsje@dshs.wa.gov

Re: Z-0836.1 Definition of Developmental Disabilities

Dear Janet Adams,

These comments are in response to your request for suggested revisions to Z-0836, a
bill drafted by the Department of Social and Health Services. This bill significantly limits
the current legislative mandate regarding who must be served by the Division of
Developmental Disabilities (DDD). **Disability Rights Washington (DRW) will strongly
oppose this bill if it is introduced in its current form. This is not a "housekeeping"
bill. The bill would significantly limit the current legislative mandate regarding
who DDD must serve. The bill greatly increases DDD's ability to narrow the
definition.**

1.  In recent years, DDD has moved toward severely restricting the scope of its eligibility
rules through regulations, and these restrictions have been the subject of litigation. The
statute identifies individuals with the specifically listed conditions of mental retardation
(intellectual disability), cerebral palsy, and autism.  DDD has sought to restrict or
eliminate eligibility for "other neurological conditions," "other conditions similar to mental
retardation," and "other conditions requiring treatment similar to mental retardation."

The bill allows DDD to eliminate three of the seven conditions listed in the statute as
qualifying an individual for developmental disabilities. The conditions that are vulnerable
to elimination are "other neurological conditions", "other conditions similar to mental
retardation", and "other conditions requiring treatment similar to mental retardation".
The bill does this by replacing "or another" with the phrase "or may include other", and
taking out the language that relates to specific individuals (the bill strikes: "of an
individual found by").

This change is apparently an attempt to enable DDD to successfully resist court
challenges to its regulations and practices that narrow the definition. It makes this
possible by providing the Department with greater latitude in applying the definition to
the three categories of conditions ("other neurological conditions," "other conditions

*Formerly Washington Protection & Advocacy System, DRW is a member of the National Disability Rights Network.*
*A substantial portion of the DRW budget is federally funded.*

Exhibit C

November 4, 2009
Page 2

similar to mental retardation," and "other conditions requiring treatment similar to mental
retardation.")

2. The bill eliminates the language directing the Department to write rules that ensure
the IQ is not the only determinant for the conditions, by January 1989. This might
appear to be housekeeping- the deadline is two decades in the past. However, this is
the sole statutory basis for eligibility determination on a basis other than IQ. With this
change, DDD can eliminate the rules which allow for eligibility determination based on
functional impairment (not just IQ) through the administration of the "ICAP" or other
assessment.

The individuals who are most affected by this are often those who are most difficult to
serve – and most needing service. This includes individuals with significant functional
impairment but an IQ just over the borderline for DDD eligibility.  Many of the people
affected by this change are homeless, in jail, at state psychiatric hospitals, and in
prison. They clearly need and benefit from DDD services, and without them they are
extremely vulnerable to continued abuse, incarceration, institutionalization, and
homelessness.

I am attaching joint comments that were sent by Northwest Justice Project, Disability
Rights Washington, Columbia Legal Services, the ARC, and the Developmental
Disabilities Council this spring when DDD proposed regulations that would have
similarly narrowed eligibility for DDD services. DDD correctly decided not to move
ahead with that effort. Please review the attached letter and reconsider your proposal
for these changes to the statute.

Thank you for this opportunity to provide these comments prior to the legislative
session.

Sincerely,

David Lord

David Lord (mr)
Public Policy Director
Disability Rights Washington

# Exhibit D



715 Tacoma Ave. South
Tacoma, WA 98402
Tel. (253) 272-7879
Fax (253) 272-8226

Toll Free 1-888-201-1015
www.nwjustice.org

César E. Torres
Executive Director

March 24, 2009

DSHS Rules Coordinator
PO Box 45850
Olympia, WA. 98504
Sent by first class mail and by email to DSHSRPAURulesCoordinator@dshs.wa.gov

Re:  Comments on DDD proposed amendments to WAC Chapter 388-823

Dear Rules Coordinator:

These comments are in response to the public notice at WSR 09-04-064 announcing the Division of Developmental Disabilities' (DDD's) proposal to amend its eligibility rules contained in WAC Chapter 388-823.  DDD is proposing to eliminate its current regulations that define DDD eligibility criteria for "other conditions similar to mental retardation," and to create new and more restrictive combined eligibility criteria for "another neurological condition," and "other condition closely related to mental retardation or that requires treatment similar to that required for individuals with mental retardation."

The Department should abandon these proposed rules revisions for several reasons.

First and foremost, the financial landscape has changed dramatically since the Notice of Proposed Rulemaking was filed on February 2, 2009.  As you are well aware, the Washington State legislature is currently writing the budget for the 2009-2011 biennium and substantial cuts to every state department are likely.   The American Recovery and Reinvestment Act of 2009 presents Washington with the opportunity to draw down significant federal dollars.   All state agency rulemaking should be carefully analyzed to ensure that opportunities for federal contribution are maximized, particularly given our state's significant budget deficit.   These rule revisions would set new eligibility criteria for DDD-administered Medicaid-funded programs, that will, if adopted, jeopardize our state's eligibility for enhanced Federal Medical Assistance (FMAP) payments under the American Recovery and Reinvestment Act of 2009 (ARRA), Pub. L. No. 111-5, and therefore should not be adopted.

Secondly, these proposed amendments to WAC Chapter 388-823 will result in the denial and termination of DDD services to significant numbers of individuals with lifelong developmental disabilities whom DDD has been mandated by the legislature to serve.  As it





Exhibit D

Letter to DSHS Rules Coordinator
Re:  comments on DDD proposed amendments to WAC Chapter 388-823
March 24, 2009
Page 2 of 9.

has previously been informed,[1] these revisions restrict eligibility for DDD services in ways
that violate DDD's statutory mandate that it serve all individuals who's conditions meet the
definition of "Developmental Disability" contained in RCW 71A.10.020(3).

Finally, the DDD eligibility criteria contained in these rules revisions are clearly more
restrictive than the federal eligibility criteria for both ICF/MR admissions and HCBS waiver
eligibility.  The proposed rules therefore violate federal Medicaid law.

The undersigned advocates urge the Department to halt adoption of these rules.   We request
a meeting with Department representatives to determine whether there are lawful and less
burdensome alternatives to this proposed rule making that it would consider and that will
ensure that Washington receive the maximum amount of federal dollars under the American
Recovery and Reinvestment Act of 2009.

Alternatively, if DDD determines that it will proceed with the adoption of these "significant
legislative rules," the Department must comply with the requirements of RCW 34.05.238 by
adequately documenting in its rule making file that it has complied with all of the required
pre-adoption determinations and disclosure requirements regarding the purpose and expected
impact of these rules revisions.

1.  **The proposed rules revisions will jeopardize our state's eligibility for enhanced
    Federal Medical Assistance Percentage (FMAP) payments under the American
    Recovery and Reinvestment Act of 2009.**

The Federal Medical Assistance Percentage (FMAP) is federal payment to the states for
Medicaid-funded services.  Recently passed federal legislation, the American Recovery and
Reinvestment Act of 2009 (ARRA), Pub. L. No. 111-5 (passed after the filing of the Notice
of Proposed Rulemaking on February 2, 2009), provides for enhanced FMAP payments to
states for a "recession adjustment period" that will last through December 31, 2010.  ARRA
§5001.  To be eligible for the enhanced FMAP payments, the federal law requires that states
maintain the "eligibility standards, methodologies, and procedures" for Medicaid-funded
programs that were in effect on July 1, 2008.  ARRA § 5001(f)(1)(A).

The requirement that existing Medicaid eligibility standards be maintained as a condition of
Washington's receipt of enhanced FMAP applies to all Medicaid-funded programs, including
those that are administered by DDD such as ICF/MR placements and HCBS waiver
eligibility.  DDD's proposed regulations modifying DDD eligibility criteria will create new
eligibility criteria to access these DDD-administered Medicaid-funded services, and will
therefore jeopardize our state's receipt of enhanced FMAP funding.  DDD should abandon
these proposed eligibility rules revisions in order to comply with federal requirements for
enhanced FMAP funding contained in the American Recovery and Reinvestment Act of 2009
(ARRA), Pub. L. No. 111-5.

---

[1] Advocates submitted detailed comments on previous versions of these proposed rules revisions on 9.23.2008
and 12.19.2008 (attachment "A").  The proposal contained at WSR 09-04-064 does not differ substantially from
the previous versions provided by DDD.

2. **The proposal to create new combined eligibility criteria for "another neurological condition," and "other condition closely related to mental retardation" will significantly restrict DDD eligibility beyond what is allowed or contemplated by the governing Developmental Disabilities Statute.**

The Department has claimed in previous correspondence regarding this proposed rule making that its statutory authority to further define the term "developmental disability" contained in its governing statute allows it to combine and re-set the eligibility criteria for "another neurological or other condition of an individual found by the secretary to be closely related to mental retardation or to require treatment similar to that required for individuals with mental retardation" in the new and restrictive manner that it is proposing.[2]  However, the Department's authority to make rules depends, in the first instance, on the plain language of the statutory definition contained in RCW 71A.10.020(3)  *Campbell v. DSHS*, 150 Wn.2d 881, 894, 83 P.3d 999 (2004).

RCW 71A.10.020(3) defines a DDD qualifying "Developmental Disability" as:

> a disability attributable to mental retardation, cerebral palsy, epilepsy, autism, or another neurological or other condition of an individual found by the secretary to be closely related to mental retardation or to require treatment similar to that required for individuals with mental retardation... ... ... .. ...

*Id.*

As stated above, DDD's proposed rules revisions would eliminate its current regulations that define DDD eligibility criteria for "other conditions similar to mental retardation," and would create new combined eligibility criteria for "another neurological condition," and "other condition closely related to mental retardation or that requires treatment similar to that required for individuals with mental retardation."  The proposed combined regulations would modify and restrict long-standing DDD eligibility criteria by:

- requiring that all qualifying conditions be "a diagnosis by a licensed physician," proposed WAC 388-823-0600(1); and

- requiring that all qualifying diagnosed conditions be "an impairment of the central nervous system involving the brain and/or spinal cord or a chromosomal disorder," proposed WAC 388-823-0600(1); and

- requiring that all qualifying diagnosed condition be "other than mental retardation, autism, cerebral palsy, or epilepsy," proposed WAC 388-823-0600(1)(d); and

---

[2] Letter from Bruce Work, Assistant Attorney General, January 21, 2009 (attachment "B") at 2.

Letter to DSHS Rules Coordinator
Re:  comments on DDD proposed amendments to WAC Chapter 388-823
March 24, 2009
Page 4 of 9.

- requiring that evidence of impaired intellectual functioning as a result of the qualifying condition include both "a FSIQ score 1.5 or more standard deviations below the mean" and "significant academic delays .. … ..more than two standard deviations below the mean .. … .. in both broad reading and broad mathematics," proposed WAC 388-823-0615((1)(a)(i)-(ii).

These new restrictions on who may diagnose and what may be a qualifying diagnosis for "[an]other condition similar to mental retardation" will prevent substantial numbers of previously eligible individuals with recognized developmental disabilities, who have been diagnosed by qualified professionals, and who have demonstrated cognitive and functional impairments from establishing and/or re-establishing their DDD eligibility.

Moreover, there is no statutory basis or justification for these additional proposed restrictions on DDD eligibility for individuals who have "[an]other condition closely related to mental retardation." Adoption of these rules is outside the statutory authority given to DDD by the legislature. The Department's claims that these new restrictions will not significantly reduce the numbers of DDD-qualifying individuals or result in terminations of presently eligible DDD clients is not true.

The Department should abandon these proposed rules revisions, and should work with advocates and Developmental Disabilities experts to craft DDD eligibility rules that truly implement the statutory requirement which makes individuals who have "other conditions similar to mental retardation" eligible for DDD services.

3. **The proposal to add the statutory language conferring DDD eligibility on individuals who "require treatment similar to that required for individuals with mental retardation" into DDD's eligibility rules without creating any criteria or process for determining eligibility on this statutorily required basis violates the governing Developmental Disabilities Statute.**

Although the governing statutory definition of "developmental disability" includes an explicit requirement that DDD eligibility be conferred on individuals who have conditions that "require treatment similar to that required for individuals with mental retardation," *see* RCW 71A.10.020(3), DDD's implementing regulations have never included rules that define or implement this separate statutory basis for DDD eligibility.

The Department is now proposing (in response to a recent court decision) to change every reference to "other neurological condition" and "condition similar to mental retardation" in its existing eligibility rules to the more complete language in the statute: "another neurological or other condition that is closely related to mental retardation or that requires treatment similar to that required for individuals with mental retardation." While this is an obvious response to recent conclusions by the Thurston County Superior Court that "there are no Department rules that further define or implement" the "clearly separate" statutory mandate that it determine DDD eligibility for individuals who "require treatment similar to that required for individuals with mental retardation," the proposed regulations, by merely

parroting the statute, say nothing useful. No eligibility criteria are fleshed out. No process for determining DDD eligibility based specifically on treatment needs is described. The proposed regulations would therefore continue to violate the explicit mandate in RCW 71A.10.020(3) that DDD have some process or criteria for determining DDD eligibility based on an individual's treatment needs.

The Department's on-going failure to implement the requirement in its governing statute that it determine DDD eligibility based on treatment needs despite a recent Court decision that it must do so is arbitrary and capricious,[3] and violates the plain language of  RCW 71A.10.020(3).  The Department should abandon these proposed rules revisions, and should work with advocates and Developmental Disabilities experts to craft DDD eligibility rules truly implement statutory requirement that DDD eligibility be determined for individuals who "require treatment similar to that required for individuals with mental retardation."

 4. **The proposed rules revisions violate federal Medicaid law because they create more restrictive eligibility criteria for Medicaid-funded ICF/MR admissions and/or HCBS waiver placement than contained in federal law.**

The Department has claimed in previous correspondence regarding this proposed rule making that it does not believe these proposed regulations "would prohibit access to [Medicaid-funded] services to which persons are entitled."[4] The Department is mistaken and should review federal eligibility criteria for Medicaid-funded ICF/MR admissions and HCBS waiver placements.

The Medicaid Act authorizes optional Medicaid funding for the placement of qualifying individuals with developmental disabilities in state-run intermediate care facilities for the mentally retarded (ICF-MR).  *See* 42 U.S.C. § 1396a(a)(15). The Medicaid Act also allows states to offer alternative community-based Medicaid-funded HCBS Waiver services to those individuals who have been determined to meet ICF/MR eligibility criteria. *See* 42 U.S.C. § 1396n(c)(1).  Washington State has opted to provide both Medicaid-funded ICF/MR placements and alternative HCBS waiver-funded services.  Both of these Medicaid-funded programs are available only to persons who have qualified, under the DDD statute, for DDD services.

Federal law provides that Medicaid-funded placement in ICF-MR institution be available to "the mentally retarded or persons with related conditions" who require health or rehabilitative services and are receiving "active treatment." 42 U.S.C. § 1396d(d). The federal regulation that further defines ICF/MR and HCBS waiver eligibility for "persons with

---

[3] *See Washington Independent Telephone Ass'n v. Washington Utilities and Transp. Com'n*, 148 Wash.2d 887, 64 P.3d 606 (2003)(an agency action is arbitrary and capricious if it is "willful and unreasoning and taken without regard to the attending facts or circumstances."); *See also Rios v. Dept. of Labor and Industries*, 145 Wn.2d 483 (2002).

[4] Attachment "B" at 3.

Letter to DSHS Rules Coordinator
Re:  comments on DDD proposed amendments to WAC Chapter 388-823
March 24, 2009
Page 6 of 9.

related conditions" has been re-codified at 42 C.F.R. § 435.1010.  This rule defines ICF/MR
eligible "persons with related conditions" to mental retardation as:

> individuals who have a severe, chronic disability that meets all of the
> following conditions:
>
> (a) It is attributable to-
>
>> (1)  Cerebral palsy or epilepsy; or
>>
>> (2)  Any other condition, other than mental illness, found to be
>> closely related to mental retardation because this condition
>> results in impairment of general intellectual functioning or
>> adaptive behavior similar to that of mentally retarded
>> persons, and requires treatment or services similar to those
>> required for these persons.
>
> (b) It is manifested before the person reaches age 22.
>
> (c) It is likely to continue indefinitely.
>
> (d) It results in substantial functional limitations in three or more of
>     the following areas of major life activity:
>
>> (1) Self-care.
>> (2) Understand and use of language.
>> (3) Learning.
>> (4) Mobility
>> (5) Self-direction.
>> (6) Capacity for independent living.

42 C.F.R. § 435.1010.

The CMS State Medicaid Manual, the primary federal guidance document for state Medicaid
programs, interprets this federal definition of ICF/MR eligible "persons with related
conditions" as requiring that states' determinations "as to who is eligible for ICF/MR care
must be based on the need of each individual for ICF/MR services and not merely on the
diagnosis of the individual." CMS, State Medicaid Manual § 4398.E (attached).  The
Medicaid Manual further provides explicit guidance on ICF/MR eligibility for individuals
who are dually diagnosed developmentally disabled and mentally ill:  "there is no basis for
requiring that dually diagnosed individuals be primarily mentally retarded or have any other
primary condition in assessing the need for ICF/MR placement."

*Parry v. Crawford*, 990 F. Supp. 1250 (D. Nev. 1998)(attached), involved the State of
Nevada's efforts to redefine ICF/MR eligibility in a manner inconsistent with the definition
in federal regulation quoted above.  The court held that:

Case 3:12-cv-05004-RBL   Document 1-1   Filed 01/05/12   Page 22 of 36
Letter to DSHS Rules Coordinator
Re:  comments on DDD proposed amendments to WAC Chapter 388-823
March 24, 2009
Page 7 of 9.

> Congress intended to provide [ICF/MR] services to those who are
> financially and functionally needy through the Medicaid Act. The purpose
> of the Act mandates that the definitions of ICF-MR encompass both those
> who are diagnosed with mental retardation and those who have conditions
> related to mental retardation.

*Id.* at 1256-57.

*Parry* held that Nevada's efforts to restrict ICF/MR admissions to individuals with certain
qualifying diagnoses while denying the benefit to others with mental retardation and "related
conditions" meeting the definition now contained in 42 C.F.R. § 435.1010 violated federal
Medicaid law in two respects.  First, the federal law contains a comparability requirement
that the Medicaid-funded services available to any categorically needy individual must be
"equal in amount, duration, and scope for all recipients in the group,"  42 USC
1396a(a)(10)(B)(i); 42 CFR 440.240.  Second, the Medicaid Act contains a sufficiency
requirement that state offered Medicaid-funded services be sufficient in amount, duration and
scope to reasonable achieve the purpose of the federal law, 42 CFR 440.230(b).  *Id.*

The Department's proposed rules violate the *Parry* holding because they create more
restrictive eligibility criteria for Medicaid-funded ICF/MR admissions and/or HCBS waiver
placement than federal law allows for "the mentally retarded or persons with related
conditions."  The Department should abandon these proposed DDD eligibility rules revisions
because they violate federal Medicaid law.

### 5.  The Department must comply with the pre-promulgation requirements for these "significant legislative rules" contained in RCW 34.05.328.

If it determines that it will proceed with adoption of these rules revisions, the Department
must fully comply with the multiple pre-adoption documentation requirements for
"significant legislative rules" contained in RCW 34.05.328, including the requirement that
that it explain, in detail, the purpose of this rule making, and that it demonstrate that it has
considered other options.  Thus far, the Department's explanations justifying these revisions
have been inadequate.  If the Department proceeds with promulgation of these rules, its rule
making file must contain "documentation of sufficient quantity and quality so as to persuade
a reasonable person" that it has engaged in the careful analysis required by RCW 34.05.238.
See *id.* at § (2).

RCW 34.05.328(1) requires that prior to the adoption of significant legislative rules, the
Department must: "[c]learly state *in detail* the general goals and specific objectives of the
statute that the rule implements" (emphasis added), and must explain in detail its
determination "that the rule is needed to achieve the [the Department's stated] general goals
and specific objectives."  The Department must also "analyze alternatives to [the proposed]
rule making and the consequences of not adopting the rule."  *Id.*

In addition, the statute requires that the Department's cost-benefit analysis for the proposed
rule making include a determination "that the probable benefits of the rule are greater than its

probable costs." The Department must show that it has considered alternative proposals, and determined that the proposal being adopted is "the least burdensome alternative for those required to comply with it." *Id.* at § (1)(c-e).

Further, the Department must determine that the proposed rules do not violate federal or state law, *id.* at § (1)(f); and justify any difference, if any, between the requirements of the rule and federal regulations; *id.* at § (1)(h); and coordinate the rule, to the maximum extent practicable, with federal regulations that are applicable to the same subject matter. *Id.* at § (1)(h)(i).

The Department should not proceed with the adoption of these rules. Instead, the Department should work jointly with advocates and developmental disabilities experts to write fair and lawful regulations governing DDD eligibility. Doing so will allow the Department to avoid the loss of expanded federal FMAP contributions as well as the possibility of costly litigation. We would welcome the opportunity to meet with you and discuss our ideas for regulations concerning DDD eligibility.

Sincerely,

Todd H. Carlisle, Attorney at Law
NORTHWEST JUSTICE PROJECT

Amy L. Crewdson, Attorney at Law
COLUMBIA LEGAL SERVICES

Regan Bailey, Director of Legal Advocacy
DISABILITY RIGHTS WASHINGTON

cc.     Ed Holen, Director
        Washington State Developmental Disabilities Council
        edh@CTED.WA.GOV

        Sue Elliot, Executive Director
        The Arc of Washington State
        sue@arcwa.org

Letter to DSHS Rules Coordinator
Re:  comments on DDD proposed amendments to WAC Chapter 388-823
March 24, 2009
Page 9 of 9.

Bruce Work, AAG
OAG, DSHS DDD Division
Washington State OAG
BruceW@ATG.WA.GOV


Jean Nist, Attorney at Law
TEAMCHILD
jeannie.nist@teamchild.org


Karen Pillar, Attorney at Law
TEAMCHILD
 karen.pillar@teamchild.org

# Exhibit E



# DISABILITY RIGHTS WASHINGTON

Formerly known as Washington Protection & Advocacy System

315 - 5th Avenue South, Suite 850
Seattle, WA 98104
T:  206-324-1521    800-562-2702
TTY: 206-957-0728   800-905-0209
F   206-957-0729
www.DisabilityRightsWA.org

December 21, 2011

**VIA FIRST CLASS AND ELECTRONIC MAIL**

Linda Rolf, Director
Division of Developmental Disabilities
P.O. Box 45310
Olympia, WA  98504-5310

**Re: Loss of Services from Categorical Exclusions Based Upon Disability**

Dear Ms. Rolfe,

As you know, Disability Rights Washington (DRW) is a private non-profit advocacy
organization with a federal mandate to provide protection and advocacy services to individuals
with disabilities in the state of Washington pursuant to the Developmental Disabilities Assistance
and Bill of Rights Act, 42 U.S.C. § 10541, *et seq.*, the Protection and Advocacy for Individuals
with Mental Illnesses Act, 42 U.S.C. § 10801, *et seq.*, the Protection and Advocacy for
Individual Rights Act, 29 U.S.C. § 794e, and the regulations promulgated thereto, as well as
RCW 71A.10.080.  Pursuant to its federal mandate under the Developmental Disabilities
Assistance and Bill of Rights Act, 42 U.S.C. § 15041, *et seq.* and its implementing regulations,
Disability Rights Washington is investigating potential abuse and neglect of people with
developmental disabilities who have been denied services, lost services, or currently face
imminent loss of services when their eligibility is reassessed.

Disability Rights Washington has received reports and has probable cause to suspect abuse and
neglect of individuals who need Division of Developmental Disability (DDD) services but are
denied or terminated due to categorical exclusions based upon disability type that have been
established by DDD's Other Conditions Determination Committee.  As part of its investigation
into the harm such denials and terminations cause, it is necessary that Disability Rights
Washington be provided with a list of people who:

1.  Have been denied DDD services under the other conditions category due to their
    condition being categorically excluded by the Other Condition Determination
    Committee;

2.  Have been terminated from DDD services under the other conditions category due to
    their condition being categorically excluded by the Other Condition Determination
    Committee;

*Formerly Washington Protection & Advocacy System, DRW is a member of the National Disability Rights Network.*
*A substantial portion of the DRW budget is federally funded.*

Exhibit E

December 21, 2011
Page 2

3. Are currently eligible for DDD services under the other conditions category but will lose services upon their next eligibility review due to their condition being categorically excluded by the Other Condition Determination Committee.

Along with the names and contact information of the individual service recipients, Disability Rights Washington also needs the names and contact information for any legal guardians they may have. *Disability Law Center of Alaska, Inc. v. Anchorage School Dist.*, 581 F.3d 936 (9th Cir. 2009)(holding P&A Acts authorize access to otherwise confidential information indentifying people with disabilities and their guardians); *see also* 42 C.F.R. § 51.43; 45 C.F.R. § 1386.22(i). Please provide the phone number and address of each individual so that Disability Rights Washington may follow up with them individually as necessary to conduct its investigation.

Pursuant to federal statute, access to the information necessary to conduct a full investigation must be provided within **three business days**. 42 U.S.C. § 15043 (a)(2)(J)(i). I thank you in advance for your cooperation. Please feel free to contact me at (206) 324-1521, ext. 240 with any questions you have regarding this request.

Sincerely,

David Carlson
Associate Director of Legal Advocacy

C: Edward Dee, Senior Counsel

# Exhibit F



Rob McKenna
# ATTORNEY GENERAL OF WASHINGTON
7141 Cleanwater Dr SW • PO Box 40124 • Olympia WA 98504-0124

December 23, 2011

Disability Rights

JAN 0 3 2012

Washington

Regan Bailey, Director of Legal Advocacy
David Carlson, Associate Director of Legal Advocacy
Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, WA 98104

**RE:** **Your December 21 Letters Concerning DDD Other Condition Eligibility**

Dear Ms. Bailey and Mr. Carlson:

I am writing in response to your December 21 letter to Susan Dreyfus, as well as Mr. Carlson's separate letter sent the same date to Linda Rolfe. Both letters indicate DRW's concerns with DDD's "other condition" eligibility category.

In your letter to Susan Dreyfus, you ask that DDD "immediately end its current practice of categorically excluding entire classes of individuals" from DDD eligibility, and threaten to file suit if DDD does not take action by January 4. The Department strongly disagrees with your characterization of the DDD "other condition" eligibility rules and policies, and with your claim that DDD's practices violate federal law.

However, we think that it may be fruitful to discuss "other condition" eligibility with you to better understand your concerns, and to identify any areas of agreement regarding changes to DDD's eligibility practices without resort to litigation. At your earliest convenience prior to January 4, we would like to begin that dialogue with a meeting between you and DDD Central Office staff.

In Mr. Carlson's separate letter to Linda Rolfe, you seek names and contact information of individuals for whom DDD services were denied or terminated based on the conditions reviewed by the OCDC, and contact information for any of their guardians. DDD is without authority to provide this information to you because the individuals are not "DDD consumers" as defined in the DDD/DRW access agreement. Even if they were, your letter seeks information about unnamed individuals with whom you have had no contact at all. We believe that your access to records must be based upon information about an individual that gives you probable cause to believe that individual has been abused and neglected.

ATTORNEY GENERAL OF WASHINGTON

December 23, 2011
Page 2

Regarding your request for names of persons who are currently eligible for DDD services but who will lose eligibility following their next review, there are two reasons why DDD cannot provide that information. First, the outcome of their next review is entirely speculative. Second, since they are currently eligible for DDD services, your assertion of probable cause that abuse or neglect has occurred is premature to say the least.

DSHS will therefore consider your request to be a public records request and treat it according to the Public Records Act. I am not sure how the department's public records rules and policies will apply to your request. You should hear from DSHS within five days of your request.

Again, I hope that we can meet soon to discuss your concerns. Please contact me at your earliest convenience to discuss scheduling a meeting. (Please note that state offices are closed on Monday, December 26 and Monday, January 2.) I look forward to hearing from you.

Sincerely,

Jonathon Bashford
Assistant Attorney General

# Exhibit G



# DISABILITY RIGHTS
# WASHINGTON

Formerly known as Washington Protection & Advocacy System

315 - 5th Avenue South, Suite 850
Seattle, WA 98104
T:   206-324-1521     800-562-2702
TTY: 206-957-0728    800-905-0209
F:   206-957-0729
www.DisabilityRightsWA.org

December 27, 2011

**BY ELECTRONIC MAIL**

Jonathan Bashford
Assistant Attorney General
Social & Health Services Division
PO Box 40124 | Olympia, WA  98504-0124

**Re: DDD's Other Condition Criteria, and DDD's refusal to provide name and contact information**

Dear Mr. Bashford:

Thank you for the prompt response to Disability Right Washington's December 21st letters that you provided in your December 23rd letter. In your letter you suggested a meeting between Disability Rights Washington and the department to explore possible areas of agreement regarding the use of the "other conditions' category of eligibility. Disability Rights Washington would like to discuss the "other condition" category with department representatives, and hopes an agreement can be found that allows an individualized assessment of disability. Disability Rights Washington's office is closed this week. Therefore, I would like to propose we meet on January 3[rd] or 4[th]. Please let me know if there is a time either of those days that works for the department representatives.

Your letter also expressed the department's rationale for denying Disability Rights Washington's request for the identity and contact information for certain individuals, pursuant to its federal access authority. Instead of providing the requested information within the statutory three day timeframe, the department insists that it will only provide information which is authorized under the state public disclosure statute. This, of course, takes much longer than the three day timeframe, and more importantly prevents Disability Rights Washington from gaining access to personally identifiable information, which is precisely what Disability Rights Washington requested. Disability Rights Washington finds each of the department's rationales for denial of access without merit.

First, the department asserts that the access agreement between Disability Rights Washington and the department's Division of Developmental Disabilities (DDD) prevents the department from disclosing the names of individuals who are not current DDD clients. The agreement is merely intended to operationalize the provisions of the DD Act. The agreement itself acknowledges that it does not limit the authority and obligations generated by the Act in any way. *Access Agreement Between WPAS and DDD* § I.B. Nowhere does federal law limit the duty of disclosure of information to entities currently serving the individual. *See* 42 U.S.C. §15041 *et seq.*

---

Exhibit G

December 27, 2011
Page 2

     Second, the department asserts that the access authority provided by the DD Acts is limited to individuals with which Disability Rights Washington has a relationship. Your letter provided no citation or support for such a narrow reading of the act. I suggest you review the legal authority cited in the previous letter. *Disability Law Center of Alaska, Inc. v. Anchorage School Dist.*, 581 F.3d 936 (9th Cir. 2009)(holding P&A Acts authorize access to otherwise confidential information indentifying people with disabilities and their guardians); *see also* 42 C.F.R. § 51.43; 45 C.F.R. § 1386.22(i). *Disability Law Center of Alaska* and the regulations are directly on point with this issue and clearly provides that federal law requires the disclosure of the identity of individuals for whom the protection and advocacy system believes are at risk of abuse or neglect. *Id.*

     Finally, Disability Rights Washington disagrees with the department's assertion that it is not required to provide information about individuals who will be terminated in their next review, because the department believes the likelihood for termination is speculative and thus the request is premature. Once again, the department provides no legal authority for this limitation it has read into the DD Act. The unfortunate reality is that due to the department's categorical exclusion of certain diagnoses under the other conditions criteria, there is nothing speculative about individuals being terminated as a result of their particular diagnosis. The department maintains a list of diagnoses that may never be used for the purposes of qualifying under the other condition category. Disability Rights Washington has requested the names and contact information of only those individuals who previously used one of the now disqualified diagnoses to be found eligible in the past, as these individuals will be terminated if they are ever reassessed. Therefore, each of these individuals will be terminated at some point, and those who understand the consequences of reassessment may currently forgo requesting additional needed services as long as possible in order to avoid a reassessment and the resulting loss of their present services.

     Disability Rights Washington reasserts it right to the prompt disclosure of the requested name and contact information pursuant to the DD Act, and requests that the department provide access to the requested information within three business days. Access to the requested names and contact information is well established, and if the department continues to deny Disability Rights Washington access, Disability Rights Washington will have no other choice but to file a case in federal court to enforce its rights. In doing so, Disability Rights Washington will seek immediate injunctive relief in order to proceed with its investigation of possible harm resulting from termination and denial of eligibility for necessary services, and request that the court award Disability Rights Washington its fees and costs associated with ending the state's interference with Disability Rights Washington's federal mandate.

Sincerely,

s/David Carlson

David Carlson
Associate Director of Legal Advocacy

# Exhibit H



**STATE OF WASHINGTON**
**DEPARTMENT OF SOCIAL AND HEALTH SERVICES**
*DIVISION OF DEVELOPMENTAL DISABILITIES*
*P.O. BOX 45310 • Olympia, WA 98504-5310*

Disability Rights
JAN 0 3 2012
Washington

December 28, 2011

David Carlson
Associate Director of Legal Advocacy
Disability Rights Washington
315 – 5th Avenue South, Suite 850
Seattle, Washington 98104

Dear Mr. Carlson:

It has been determined that your request for information sent to Linda Rolfe, dated December 21, 2011, does not meet the standards to allow a response under the federal mandates applying to DRW. Instead, your request must be considered to be a request for public records under the Washington Public Records Act in Ch. 42.56 RCW.

While the information you seek would be considered to be within public records held by the Department of Social and Health Services, that information is confidential client information exempt from disclosure and cannot be produced under the Public Records Act except to individuals with legal authority to obtain client records,

The information you request is exempt from disclosure as identifiable health information under the HIPAA Privacy Rule in 45 CFR 164.402 and RCW 70.02.020. It is further personal information about clients held in Department files exempt from disclosure under RCW 42.56.230(1). These state and federal laws that govern the Department of Social and Health Services (DSHS) programs do not allow us to give you the names and contact information of individual service recipients or their legal guardians held by DSHS, unless you obtain authorization from the clients or a court order granting you access entered after prior notice to the Department under RCW 42.56.210(2). The federal law you cite in your letter does not give you authority to obtain this information in this instance and release of the information you request would violate the privacy rights of these clients.

If served with a subpoena, DSHS will object under CR 45(c)(2)(B).

Exhibit H

David Carlson
December 28, 2011
Page 2

If you believe I have denied your request in error, you may seek internal review under WAC
388-01-130(1) by writing to Don Clintsman, DDD Public Records Appeals Officer. If you have
any questions, please feel free to contact the Assistant Attorney General or me. Thank you.

Sincerely,

Deborah Hoines, DDD Public Disclosure Coordinator
Division of Developmental Disabilities

Enclosures
cc:     Ed Dee, Assistant Attorney General
        Don Clintsman, DDD Public Records Appeals Officer