HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DISABILITY RIGHTS WASHINGTON,

    Plaintiff,

v.

LINDA ROLFE, in her official capacity as Director of Division of Developmental Disabilities, and WASHINGTON DIVISION OF DEVELOPMENTAL DISABILITIES,

    Defendants.

No. 3:12-cv-05004-RBL

ORDER DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION
[Dkt. #2]

THIS MATTER comes before the Court on Plaintiff's Motion for a Preliminary Injunction [Dkt. #2]. Disability Rights Washington seeks to compel the State of Washington to release personal contact information of individuals, and their legal guardians, who the State has determined are not eligible for disability services, or who Disability Rights Washington believes will lose their eligibility upon a future benefits review hearing. Because the federal Protection and Advocacy Acts do not authorize such disclosure without consent or probable cause of abuse or neglect, and Disability Rights Washington is unlikely to succeed on the merits of its request under the circumstances presented, Plaintiff's motion is DENIED.

ORDER - 1

# I. BACKGROUND

Congress enacted the Developmental Disability Assistance and Bill of Rights Act (DD Act) to "assure that individuals with developmental disabilities and their families participate in the design of and have access to needed community services" and other forms of assistance. 42 U.S.C. § 15001(b). In order for a state to receive federal funding under the DD Act, the state must have an independent system in effect "to protect and advocate the rights of individuals with developmental disabilities." 42 U.S.C. § 15043(a)(1). The Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801 *et seq.*, and the Protection and Advocacy of Individual Rights Act, 29 U.S.C. § 794e *et seq.*, contain similar requirements. These protection organizations are commonly referred to as "protection and advocacy systems." The DD Act authorizes state protection and advocacy systems "to investigate incidents of abuse and neglect of individuals with developmental disabilities if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred." 42 U.S.C. § 15043(a)(2)(B). In order to effectuate this investigatory function, the DD Act also grants the systems access to "all records" of individuals with developmental disabilities under certain circumstances. 42 U.S.C. § 15043(b)(2)(I)–(J).

Plaintiff Disability Rights Washington (DRW), a nonprofit corporation, serves as Washington's protection and advocacy system. Pl.'s Compl. at 3 [Dkt. #1]; *see also* Wash. Rev. Code 71A.10.080(2) (authorizing the Governor to designate an agency for the protection and advocacy of the rights of persons with developmental disabilities). DRW has the authority and responsibility to pursue legal, administrative, and other appropriate relief to protect individuals with developmental disabilities "who are or who may be eligible for treatment, services, or habilitation." 42 U.S.C. § 15043(a)(A)(i). Defendant Washington Division of Developmental

ORDER - 2

Disabilities (State or DDD) is the state agency responsible for administering services to persons with developmental disabilities. Pl.'s Compl. at 3 [Dkt. #1]. The parties are signatories to an access agreement that implements the provisions of the DD Act, including specifying the terms of access to records. Pl.'s Mot., Ex. B at 11 [Dkt. #2-1].

Pursuant to this agreement and its statutory mandate, DRW sent a letter to the State on June 1, 2011, requesting specific information about individuals scheduled to change status from an Intermediate Care Facility to a Nursing Facility at a state-operated housing community. Pl.'s Reply, Ex. B at 11 [Dkt. #14]. DRW predicated its request on probable cause to investigate abuse or neglect at this location based on statements from DDD employees. *Id.* The State complied with the request and sent the specific contact information to DRW. Pl.'s Reply, Ex. C at 13 [Dkt. #14].

On December 21, 2011, DRW sent another letter explaining it "received reports and has probable cause to suspect abuse and neglect of individuals who need . . . services but are denied or terminated due to categorical exclusions based upon disability type." Pl.'s Compl., Ex. E at 26 [Dkt. #1-1]. DRW requested the names and contact information for three specific groups of individuals and their guardians: (1) individuals who have been denied services under the "other conditions" category; (2) individuals who have had their services terminated under the "other conditions" category; and (3) individuals that are currently eligible for services under the "other conditions" category but will lose services upon their next eligibility review. *Id.* at 26–27. The other conditions category refers to a catch-all provision in the State's eligibility criteria for disability services. *See* Wash. Rev. Code 71A.10.020(4).[1]

---

[1] The State defines "developmental disability" to include intellectual disability, cerebral palsy, epilepsy, autism, or any "other condition of an individual found by the secretary to be closely related to an intellectual disability." *Id.* In order to promote consistency in statewide eligibility determinations, a committee known as the Other Condition Determination Committee (OCDC) maintains a list of conditions the State believes are included in and excluded

On December 23, 2011, the State declined to provide the contact information DRW requested. Pl.'s Compl., Ex. F at 29 [Dkt. #1-1]. The State determined it was not authorized to disclose information about individuals that are not disabled as defined by the parties' access agreement; it questioned the basis for DRW's probable cause; and it concluded the third category of individuals was not readily identifiable. *Id.* DRW subsequently filed this lawsuit seeking a temporary restraining order and preliminary injunction to compel the State to disclose the personal contact information.

## II. ANALYSIS

While DRW seeks both a preliminary injunction and a temporary restraining order in its complaint and caption, the motion before the Court focuses exclusively on preliminary injunctive relief. *See* Pl.'s Mot. at 2 [Dkt. #2]. The proper legal standard for preliminary injunctive relief requires a party to demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[2]

The first question is whether the parties' access agreement enables DRW to obtain the personal contact information of the three categories of individuals it has requested. The agreement states DRW "may access records" of "DDD consumer[s]" who have consented to release their information; who are unable to consent to release their information; who do not

---

from the definition of developmental disability. Def.'s Resp. at 4 [Dkt. #4]. DRW, however, believes this other conditions category is largely illusory. Pl.'s Compl. at 7 [Dkt. #1].

[2] The nature of DRW's relief might be better characterized as a permanent injunction because the release of this information "cannot be undone." *Disability Law Ctr. of Alaska, Inc. v. Anchorage Sch. Dist.*, 581 F.3d 936, 938 (9th Cir. 2009) (treating a protection and advocacy system's request for records as a permanent injunction instead of a preliminary injunction or a temporary restraining order). The standard for a permanent injunction is "actual success" rather than a "likelihood of success" on the merits. *Winter*, 555 U.S. at 32 (2008) (citing *Amoco Prod. Co. v. Vill. of Gamble*, 480 U.S. 531, 546 n.12 (1987)). Because the Court concludes DRW's request does not satisfy either standard, the Court need not determine which standard is preferable.

ORDER - 4

have legal guardians; or with respect to whom DRW has probable cause to believe he or she has been subjected to abuse or neglect.  Pl.'s Mot., Ex. B at 17 [Dkt. #2-1].  The term "DDD consumer" is expressly defined as "an individual with a developmental disability receiving support from a program funded by DDD." *Id.* at 12.  Because the individuals in the first two categories do not receive support from a state funded disability program (their benefits have either been denied or terminated), they are not DDD consumers and the access agreement does not authorize disclosure of their personal information.  The third category of individuals, those whose current benefits DRW posits will be terminated in the future, do constitute DDD consumers because they are receiving support from a program funded by DDD.  But, DRW has offered no evidence that these individuals, or their guardians, have either consented to releasing their personal information, or lack capacity or guardianship, or have been abused or neglected as required by section five of the agreement.  *See id.* at 17.  DRW does not have the authority to obtain the personal information of a group of people that does not yet exist or is not readily identifiable.

To the extent that the agreement is inconsistent with the DD Act or its implementing regulations, the parties have intended the federal statute to otherwise control.  *See id.* at 11.  The provisions in the DD Act for accessing records to support an investigation largely mirror the specifications set forth in the parties' access agreement.  *See* 42 U.S.C. § 15043(a)(2)(I).  But the DD Act appears to grant broader authority to protection and advocacy systems to obtain records from persons with developmental disabilities that are not "clients" or "consumers" of the system when there is probable cause to believe incidents of abuse or neglect have occurred.  *See* 42 U.S.C. § 14053(a)(2)(J)(i).  DRW asserts it has probable cause to believe the individuals in the three categories for which they seek information "may be abused or neglected." Pl.'s Mot. at 9

ORDER - 5

[Dkt. #9]. DRW relies on a declaration from a DRW attorney and investigator, who states: "I have interviewed several DDD clients, families, independent professionals, and DDD contracted providers who allege that each of the DDD clients has been or will soon be negatively affected by the systemic categorical exclusion of certain disabilities from the 'other condition' category." Decl. of Emily Cooper Pura at 2 [Dkt. #15]. The State responds that people who are not eligible for services are not "individuals with developmental disabilities" and therefore are not covered by the DD Act and its implementing regulations. Def.'s Resp. at 7 [Dkt. #11]. Neither the statute nor the federal regulations expressly define "developmental disability." But even if the individuals for whom DRW seeks contact information are covered by the DD Act, DRW's determination of probable cause does not withstand cursory review.

In this context, "[p]robable cause means a reasonable ground for belief that an individual with developmental disabilities has been, or may be, subject to abuse or neglect." 45 C.F.R. § 1386.19. This standard gives wide discretion to the protection and advocacy system, but it does not afford the system carte blanche to obtain sensitive personal information of people that may or may not be disabled. While the protection and advocacy system is the "final arbiter" of probable cause between the state and the system, the system's determination of probable cause is subject to judicial review. *See Iowa Prot. & Advocacy Servs., Inc. v. Gerard Treatment Programs, L.L.C.*, 152 F. Supp. 2d 1150 (N.D. Iowa 2001).

In the cases affirming a protection and advocacy system's determination of probable cause, the system has at least relied on specific allegations of abuse or neglect. In *Disability Law Center of Alaska*, for example, the protection and advocacy system "received six separate complaints regarding mistreatment of students in the intensive needs special education class at Lake Otis Elementary School." 581 F.3d at 938. In *Alabama Disabilities Advocacy Program v.*

*J.S. Tarwater Development Center*, 97 F.3d 492, 494 (11th Cir. 1996), the protection and advocacy system met the probable cause requirement when an anonymous caller alleged administrative staff forced one resident into the cold when he was ill and not properly dressed, and the resident subsequently died of pneumonia. *See also Conn. Office of Prot. & Advocacy for Pers. with Disabilities v. Hartford Bd. of Educ.*, 464 F.3d 229, 233 (2d Cir. 2006) (receiving complaints from parents and students about "inappropriate use of physical restraints and seclusion at the school"); *Ga. Advocacy Office v. Borison*, 520 S.E.2d 701, 702 (Ga. Ct. App. 1999) (responding to published articles about "bogus clinical trials and alleged incidents of abuse and neglect of study participants").

Here, DRW has not identified any instances or reports of abuse or neglect. Conversations with DDD employees may be sufficient in some circumstances; for example, the State appropriately complied with DRW's June 2011 request for information when DRW heard from DDD employees about abuse and neglect at one of the State's resident care facilities. *See* Pl.'s Reply, Ex. B at 11 [Dkt. #14]. But here, DRW bases its probable cause on reports that DDD consumers will be "negatively affected" by reductions in service eligibility. Pura Decl. at 2 [Dkt. #15]. The Court does not doubt that statewide budgetary woes will "negatively affect" a number of individuals who rely on social services. But neglect requires "a negligent act or omission . . . which caused or may have caused injury or death to an individual with developmental disabilities or which placed an individual with developmental disabilities at risk of injury or death." 45 C.F.R. § 1386.19. DRW does not provide any evidence that individuals who are found not to be developmentally disabled are at risk of injury or death.

Absent a showing of probable cause to believe persons with disabilities are being or have been *abused or neglected*, DRW's request to compel disclosure of personal information is

unlikely to prevail on the merits, and the balance of equities tips in the State's favor . Therefore, DRW has not met its burden to justify a preliminary injunction. Nothing in this order precludes DRW from conducting its investigation in accordance with its statutory mandate, either by seeking consent to release personal information from the individuals in question or by a sufficient showing of probable cause.

### III. CONCLUSION

For the reasons stated above, Plaintiff's Motion for a Preliminary Injunction [Dkt. #2] is DENIED.

**IT IS SO ORDERED**.

DATED this 23rd day of April, 2012

　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　RONALD B. LEIGHTON
　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE